UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMERICAN INSTITUTE OF PHYSICS,　　：
WILEY PERIODICALS, INC. AND
JOHN WILEY & SONS, INC.,　　　　　：

　　　　　　　　　　Plaintiffs,　　：

　　　　　-against-　　　　　　　：　　12 Civ. 528 (RHK-JJK)

SCHWEGMAN, LUNDBERG & WOESSNER,　：
P.A. AND JOHN DOE NOS. 1-10,
　　　　　　　　　　　　　　　　：
　　　　　　　　Defendants,
　　　　　　　　　　　　　　　　：
　　　　　-and-
　　　　　　　　　　　　　　　　：
THE UNITED STATES PATENT AND
TRADEMARK OFFICE,　　　　　　　　：

　　　　　　　　Intervening Defendant.　：

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF PLAINTIFFS IN SUPPORT OF THEIR MOTION TO COMPEL FURTHER DISCOVERY FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE

MANTY & ASSOCIATES, P.A.　　　　DUNNEGAN & SCILEPPI LLC
510 First Avenue North, Suite 305　　350 Fifth Avenue
Minneapolis, MN 55403　　　　　　New York, New York 10118
(612) 340-7950　　　　　　　　　(212) 332-8300

Attorneys for Plaintiffs

Plaintiffs American Institute of Physics, Wiley Periodicals, Inc., and John Wiley & Sons, Inc., (collectively, the "Publishers") respectfully submit this memorandum in support of their motion for an order: (i) compelling intervening defendant The United States Patent and Trademark Office ("PTO") to produce 16 documents involving its communications with the Copyright Office that the PTO has withheld on the ground of deliberative process privilege; and (ii) compelling further testimony of the General Counsel of the PTO concerning those communications and question that he did not answer at his deposition on the ground of deliberative privilege.

Preliminary Statement

The PTO's intervention in this civil action represents an extraordinarily unusual event. The General Counsel of the PTO has stated that he has no knowledge of the PTO intervening in any other civil action. (Dunnegan Dec. Ex. A at 225:11-228:9.)  Moreover, we can find no evidence that the PTO has ever, in its more than 200 year history, asserted a claim in an Article III Court.

The PTO's intervention is even more unusual because the PTO has sought the dismissal of the Publishers' copyright infringement claim in its entirety without knowing the facts concerning Schwegman's copying.  At its Rule 30(b)(6) deposition on February 15, 2013, the PTO disclosed that -- although it did not know the extent to which the Schwegman firm had copied the copyrighted articles,

and therefore could not know whether or not all of Schwegman's copying of the copyrighted articles was fair use -- the PTO still wants the Court to dismiss the Publishers' claims in their entirety.   The PTO's representative testified at that Rule 30(b)(6) deposition:

> Q.  Now, let me take you to two pages further in the document [prepared for the deposition to set forth the PTO's position]. . . it says, quote: The USPTO believes that Schwegman's copying and distribution of the 18 NPL items at issue here is, quote, necessary and incidental, end quote, and, therefore, qualifies as fair use. And it continues.  Is the statement that I read correct?

> A. Yes.

> Q.  So it is the PTO's position that whatever Schwegman has done is fair use, correct?

> [PTO'S COUNSEL]: Objection. Form.

> THE WITNESS: It's the PTO's position that based on their understanding of what Schwegman has done. But we don't know the -- **we don't know the full extent of everything that may have happened**.  That is what's --

> BY MR. DUNNEGAN:

> Q.  **So the PTO at this point is not willing to say that whatever Schwegman did is fair use. Right?**

> A.  **Yes.**

> Q. Okay.  **But the PTO still at this moment is asking the Court to dismiss the complaint of my clients, AIP and Wiley, in its entirety, correct?**

> A.  **Yes.**  (Dunnegan Dec. Ex. B at 161:16-162:20.)

The intriguing question is therefore "Why has the PTO intervened to advocate the dismissal of the Publishers' claims in their entirety without knowing the facts of the case?"

The answer, we submit, rests in a chain of legal and political events that has resulted in an alliance between the PTO and certain patent law firms that practice before it.  Beginning in late 2010, the Publishers sent demand letters to certain patent law firms complaining that they had made infringing copies of copyrighted articles in connection with their patent law practice; those law firms complained to the PTO; the PTO conferred with Q. Todd Dickinson, the Executive Director of the American Intellectual Property Lawyers Association, a trade association of largely patent lawyers, and Stephen Kunin, a partner at the patent law firm of Oblon Spivak, concerning a draft of its position (Dunnegan Dec. Ex. A at 90:14-91:4 and 131:17-133:13); the PTO issued a memorandum on January 19, 2012, stating that, in its opinion, the copy of copyrighted articles sent to the PTO was fair use;  the Publishers sued three patent law firms for copyright infringement based in part upon the law firms' making of internal copies; and the PTO intervened in these actions seeking dismissal of their claims in its entirety and counterclaimed advocating that any copying that is "necessary and incidental" to PTO practice is "fair use."

The PTO has advocated in its answer and counterclaim that its position serves the public interest.  (Dkt. 68 at ¶¶ 12 and 20.)   A jury, moreover, may reasonably conclude that the mere presence of the PTO in the action is a statement that the PTO is acting in the public interest.  To rebut the PTO's "public interest" advocacy, the Publishers seek to discover evidence that demonstrates that the PTO's position in this action results from a raw political effort to help patent law firms avoid liability for copyright infringement, and not an effort to apply the law in an impartial manner.

The documents exchanged between the Patent Office and the Copyright Office, long after the PTO had decided to intervene in these cases, are relevant to determine whether or not the PTO is, in fact, representing the private interests of patent law firms rather than the public interest.  The PTO has identified 16 such documents on its privilege logs ("Copyright Office Documents").   These documents are logged in chronological order on Exhibit C to the Declaration of William Dunnegan.

The PTO has nevertheless withheld these documents on the grounds of deliberative process privilege, and (at least officially) other privileges.  Even if the deliberative process privilege did apply, the PTO waived any privilege by laying bare at the deposition of Bernard Knight, its General Counsel, its institutional

thought process in deciding to intervene in these actions to advocate the "necessary

and incidental" test.[1]

Argument

I.

THE COURT SHOULD COMPEL THE PTO TO<br>PRODUCE THE COPYRIGHT OFFICE DOCUMENTS

A.      The Deliberative Process Privilege Does Not
        Apply To The Copyright Office Documents.

"[T]he ultimate purpose of [the deliberative process] privilege is to prevent

injury to the quality of agency decisions." N. L. R. B. v. Sears, Roebuck & Co.,

421 U.S. 132, 151, 95 S. Ct. 1504, 1516 (1975).  The deliberative process privilege

serves that purpose by "protecting open and frank discussion among those who

make them within the Government," Dep't of Interior v. Klamath Water Users

Protective Ass'n, 532 U.S. 1, 8-9, 121 S. Ct. 1060, 1065-66 (quoting Sears,

---

[1] The PTO acknowledged at the Knight deposition on March 25, 2013, that it needs the head of the PTO to make the necessary findings that the deliberative process should be claimed.  (Dunnegan Dec. Ex. A at 116:8-119:15). See Walsky Const. Co. v. United States, 20 Cl. Ct. 317, 320 (1990)("To assert the privilege, the Government must follow a three-step process. First, the head of the agency that has control over the requested document must assert the privilege after personal consideration. Second, the head of the agency must state with particularity what information is subject to the privilege. Third, the agency must supply the court with 'precise and certain reasons' for maintaining the confidentiality of the requested document.")(Citations omitted.). We assume that the PTO will serve those findings forthwith.  If the PTO does not serve sufficient findings concerning the documents and testimony in dispute, we will raise that issue with the Court.

Roebuck, 421 U.S. at 151, 95 S.Ct. 1504).  As explained below, an agency may only assert this privilege "if the document in question is an inter- or intra-agency memorandum which is both **predecisional** and **deliberative**." State of Mo. ex rel. Shorr v. U.S. Army Corps of Engineers, 147 F.3d 708, 710 (8th Cir. 1998)(emphasis added).

The PTO has the burden of proving its entitlement to assert the deliberative privilege. Tax Analysts v. I.R.S., 117 F.3d 607, 616 (D.C. Cir. 1997)("The government has the burden of showing that the materials were generated *before* the adoption of an agency policy and reflect the give-and-take of the consultative process.")(Internal quotes and cites omitted.); S.L. ex rel. Lenderman v. St. Louis Metro. Police Dept. Bd. of Commissioners, 4:10-CV-2163 CEJ, 2011 WL 1899211 (E.D. Mo. May 19, 2011)("The agency invoking the [deliberative process] privilege has the initial burden of showing that it applies."). See generally, In re Grand Jury Proceedings (Malone), 655 F.2d 882 (8th Cir. 1981)("The burden is on the party asserting a privilege to establish it….").

As explained below, the deliberative process privilege does not apply to the Copyright Office Documents because (i) they were created after the PTO decided to intervene in this action to assert the "necessary and incidental" test; (ii) the PTO was not seeking to deliberate with the Copyright Office, but merely allowing the

Copyright to comment for its own benefit; and (iii) the communications in them represent the views of agencies and not individuals.

    (i)    The Deliberative Process Privilege Does Not
           Apply To The Copyright Office Documents
           Because The PTO Made Its Policy Decisions Well
           <u>Before The Copyright Office Documents Were Written.</u>

The deliberative process privilege does not apply to documents created after an agency has made its decision. <u>N. L. R. B. v. Sears, Roebuck & Co.</u>, 421 U.S. at 151, 95 S. Ct. at 1516-17 ("The quality of a particular agency decision will clearly be affected by the communications received by the decisionmaker on the subject of the decision prior to the time the decision is made. However, it is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached; and therefore equally difficult to see how the quality of the decision will be affected by forced disclosure of such communications, as long as prior communications and the ingredients of the decisionmaking process are not disclosed.").

The Copyright Office Documents were created after the PTO decided intervene to assert the "necessary and incidental" test. The PTO decided to intervene, at the latest, within a couple of weeks of the filing of this action on February 29, 2012. Bernard Knight, the General Counsel of the PTO, testified:

        Q. I want to focus on the decision to intervene, rather than the
    mechanics of putting the intervention in process. The decision to

intervene was made relatively quickly, right, within days [of the filing of this action on February 29, 2012]?

    A.  **I don't remember that the decision was made within a few days. <u>It could have been a couple of weeks</u>, I don't know.**  I don't really right now have an independent recollection of how long that took.  (Dunnegan Dec. Ex. A at 290:9-15 (Emphasis added).)

The Copyright Office Documents were written in May and June, after the PTO made the decision in early March to intervene to assert the "necessary and incidental" standard. (Dunnegan Dec. Ex. C.)

Because the Copyright Office Documents involve communications that occurred <u>after</u> the PTO had decided to intervene, the deliberative process privilege does not protect them.

    (ii)   The Deliberative Process Privilege Does Not Apply To
            The Copyright Office Documents Because The PTO
            <u>Was Not Seeking Advice From The Copyright Office.</u>

    The deliberative process privilege applies only to documents that are part of an agency's deliberative process.  <u>State of Mo. ex rel. Shorr v. U.S. Army Corps of Engineers</u>, 147 F.3d 708, 710 (8th Cir. 1998) ("A document is deliberative if its disclosure would expose the agency's decisionmaking process in a way that would discourage candid discussion and thus undermine the agency's ability to perform its functions; the focus is on whether the document is part of the agency's deliberative process.").

Documents that simply comment on an agency decision, rather than help formulate an agency decision, are not subject to the deliberative process privilege. See N. L. R. B. v. Sears, Roebuck & Co., 421 U.S. 132, 151, 95 S. Ct. 1504, 1516-17 (1975)("Lower courts have uniformly drawn a distinction between predecisional communications, which are privileged, and communications made after the decision and designed to explain it, which are not.")(Citations omitted.).

The PTO admits that it knew before the creation of the Copyright Office Documents what position it would take, did not care what the Copyright Office thought, and did not consider the comments of the Copyright Office in taking a position.  Mr. Knight testified:

> Q.  Let's take a look at Exhibit 154. Page four. And the question number three at the top of the page is "the fact of and/or content of each communication between a representative of the PTO and any non-representative of the PTO concerning whether the PTO should take a position on whether internal copying of copyrighted NPL other than the copy submitted to the PTO was or was not an infringement of a copyright or was or was not a fair use of a copyrighted work." And the first sentence after that was, "there are no communications on that specific topic." Is the statement quote, "there are no communications on that specific topic" correct?
>
> [Colloquy omitted]
>
> A.  You know, reading this statement concerning whether the PTO should take a position on whether internal copying of copyrighted NPL is fair use, I don't know that, you know, I have knowledge of communications on whether or not we should take a position. **I think that we did take a position and we were going to take a position and** <u>**we knew what our position was and people were going to comment on that position. Not whether we should**</u>

**take it or not.** So just the literal language of this, it seems to be correct to me. (Dunnegan Dec. Ex. A at 296:17-298:4, emphasis added.)

Mr. Knight understood that even relatively junior attorneys at the PTO would not be looking for advice from the Copyright Office. Mr. Knight testified "I don't think that [Associate Solicitor] Tom Krause would be looking for [Copyright Office General Counsel] David Carson's recommendation for what the PTO should do." (Dunnegan Dec. Ex. A at 221:15-222:1.)

The Copyright Office Documents are therefore not part of the PTO's deliberative process, and are not protected by the deliberative process privilege.

(iii) The Deliberative Process Privilege Does Not Apply To The Copyright Office Documents Because They Reflect The Official Position Of The PTO Or The Copyright Office, And Not The Writer's Personal View.

The deliberative process privilege protects a document if it "contains the personal opinions of the writer rather than the policy of the agency." State of Mo. ex rel. Shorr v. U.S. Army Corps of Engineers, 147 F.3d 708, 710 (8th Cir. 1998).

a. The Documents The PTO Sent To The Copyright Office Represented Views Of The PTO.

The PTO admitted that the Copyright Office documents conveyed the PTO's position. (Dunnegan Dec. Ex. A at 296:17-298:4, supra p. 12.)

b.  The Documents The Copyright Office Sent To The
PTO Represented Views Of The Copyright Office.

The Copyright Office Documents that originated with the Copyright Office were from its General Counsel, David Carson.  (Dunnegan Dec. Ex. C.)  Because these communications occurred with the Copyright Office's General Counsel, the Court should infer that these communications represent the considered view of the agency and not the personal opinion of an individual. Indeed, Mr. Knight stated that his views represented the official position of the PTO because he was its chief legal officer. (Dunnegan Dec. Ex. A at 236:10-239:2.)

Alternatively, the Court should review the Copyright Office Documents in camera to determine whether they express the personal opinion of the writer or the position of the Copyright Office and PTO.  See, e.g., Marriott Int'l Resorts, L.P. v. United States, 437 F.3d 1302, 1307 (Fed. Cir. 2006)("Moreover, a trial court may conduct in-camera review of documents under this qualified branch of the executive privilege doctrine. The qualified deliberative process privilege is subject to judicial oversight.")

Because the Copyright Office Documents represent the official positions of the PTO, and presumably of the Copyright Office, and not the personal opinions of the writers, the deliberative process privilege does not cover them. [2]

---

[2]The PTO has also withheld these documents on the ground of attorney-client privilege, work product immunity and joint interest privilege.  These

B.    The PTO Waived Any Deliberative Privilege For The Copyright
      Office Documents By Explaining The Details Of How It Made Its
      <u>Decision To Intervene To Advocate The "Necessary And Incidental" Test.</u>

Even if the Copyright Office Documents were part of the deliberative

process, the PTO has waived the subject matter of the deliberative process that

resulted in the "necessary and incidental" test by disclosing the parts of that

deliberative process that are favorable to it.    The PTO disclosed, almost

completely, the details of its decision to adopt the "necessary and incidental" test.

The PTO disclosed **<u>why</u>** it developed the "necessary and incidental test.  Mr.

Knight testified:

> Q.  How did you develop the necessary and incidental test
> within the PTO?
>
> A.  We felt that it was appropriate because we don't
> know all of the facts surrounding each of the individual cases,
> how they are going to be flushed out in discovery." (Dunnegan
> Dec. Ex. A at 212:7-12.)

The PTO disclosed **<u>how</u>** it developed the "necessary and incidental" test.

Mr. Knight testified:

> Q.  How did you come up with the standard?

---

privilege claims are baseless.  There is no evidence that the PTO sought legal
advice from the Copyright Office, that the Copyright Office Documents were
prepared in anticipation of litigation, or that they involved the formulation of a
joint claim or defense to a claim.  The documents, we predict, will demonstrate
that, after the PTO communicated to the Copyright Office its decision regarding
the "necessary and incidental" test, the Copyright Office commented for its own
benefit, not the PTO's.

**A.  We came up with the standard and looked at the fair use factors and then determined that if copies were necessary and incidental that those copies would meet the definition of what is necessary under the fair use factors to qualify as fair use.**

Q.  When did you do that?

A.  We did it in establishing the standard. ...” (Dunnegan Dec. Ex. A at 253:15-23.)

The PTO disclosed its purported **legal authority** for the "necessary and incidental" standard.  Mr. Knight testified:

Q.  Let me ask a different question. What legal authority is there for the necessary and incidental test?

A.  There is legal authority under the fair use analysis.

Q.  What is that legal authority?

A.  The legal authority is outlined generally in the June -- the January 19, 2012 memo.

Q.  I thought you told me earlier that the January 19, 2012 memo, did not address the necessary and incidental test?

A.  That is true. But it addresses the fair use law, generally. That body of law, I am trying to tell you, gave us the basis for coming up with the necessary and incidental test. (Dunnegan Dec. Ex. A at 265:24-266:17.)

The PTO disclosed **who** was involved in the decision to intervene to assert the "necessary and incidental" test.  Specifically, Mr. Knight discussed the decision with Mr. Kappos, the Director of the PTO (Dunnegan Dec. Ex. A at

286:8-290:13), and Mr. Krause and Mr. Casagrande, both assistant solicitors at the

PTO. (Id. at 217:14-2:18:5.)

The PTO disclosed **when** it developed the test and decided to intervene.

After the filing of the lawsuits in Minneapolis and Chicago, the PTO immediately

began thinking about when to intervene.

> Q.  Did you take any steps to start developing any policy or procedures in response to the lawsuits which had been filed in the District of Minnesota and the Northern District of Illinois?
>
> A.  A couple of things. I may have heard about this suit in Illinois prior to being copied on Bob Stole's E-mail. These lawsuits have gotten a lot of press coverage. And I do read the blogs. So I likely learned about it prior to that.  **And once these lawsuits were being filed, I am sure it precipitated me thinking about intervening in these suits and how would we intervene and on what basis.**
>
> Q.  So as a result of learning that the lawsuits were filed, you began the process of thinking about intervention in these lawsuits, correct?
>
> A.  That would be correct. (Dunnegan Dec. Ex. A at 216:3-22 (emphasis added).)

The PTO privilege logs demonstrate that Krause circulated a document

recommending intervention in NPL litigation on March 3, 2012.  (Dunnegan Dec.

Ex. C.) While Mr. Knight could not put a precise date on the making of the

decision to intervene and said that it could have been up to "two weeks," Mr.

Knight could not exclude the possibility that the decision was made before March

2, 2012. (Dunnegan Dec. Ex. A at 290:14-291:15.)

15

Although the PTO disclosed the above information regarding its decision to intervene, it stonewalled in providing any information concerning its communications with the Copyright Office concerning the necessary and incidental test.

The PTO cannot selectively disclose its deliberations.  In <u>E.E.O.C. v. Midwest Div.-RMC, LLC</u>, 04-00883-CV-W-REL, 2006 WL 6384881 (W.D. Mo. May 31, 2006), the defendant sought deposition testimony from plaintiff, the U.S. Equal Employment Opportunity Commission, concerning the investigation and evaluation of the claim against defendant.  Although the Court held that the deliberative process privilege applied to some of that information, the Court nevertheless held that plaintiff had waived the privilege by producing documents and providing deposition testimony on the same subject matter.  <u>Id.</u> at *3 ("Finally, I do find that Plaintiff waived the protection of the deliberative process privilege with respect to three specific topics by allowing Mr. Thomas to answer some questions despite instructing him not to answer others on the same subject.") .

While the PTO may argue that the deliberative privilege cannot be waived, it has no persuasive authority for that position.  This Circuit has confirmed that a party may waive the deliberative process privilege in the context of a Freedom of Information Act Request.  <u>U.S. v. Metro. St. Louis Sewer Dist. (MSD)</u>, 952 F2d 1040, 1045 (8th Cir. 1992)("We think it beyond doubt that draft consent decrees

prepared by a federal government agency involved in litigations are covered by the

section 552(b)(5) exemption.  Less clear, however, is whether the exemption has

been waived by the government in this case.")[3]

## II.

### THE COURT SHOULD COMPEL MR. KNIGHT TO ANSWER THE QUESTIONS THAT HE REFUSED TO ANSWER BASED UPON THE DELIBERATIVE PROCESS PRIVILEGE

If the Court compels the PTO to produce the Copyright Office Documents,

then the Court should compel Mr. Knight to answer questions concerning them and

the following questions which he refused to answer based upon the deliberative

privilege.

**Q.  But to your knowledge, you don't have knowledge of anyone making any investigation concerning the Copyright Clearance Center in connection with your fair use analysis that's involved in this case, correct?**

MR. FARGO:  I'll allow that, yes or no.  Because you will get into deliberative process where **we'll object where you'll get behind the agency reason**. (Dunnegan Dec. Ex. A at 44:7-15.)
* * *
**Q. Were the comments or suggestions that you received from Mr. Cunin important to you in preparing any portion of the**

---

[5] U.S.C. § 552(b)(b), also known as FOIA Exemption 5, incorporates several civil discovery privileges, including the deliberative process privilege. Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9, 121 S. Ct. 1060, 1065-66, 149 L. Ed. 2d 87 (2001); Ameren Missouri v. U.S. E.P.A., 4:11CV02051AGF, 2012 WL 4372518, *4 (E.D. Mo. Sept. 25, 2012). In the above referenced language in Metro. St. Louis Sewer Dist. (MSD), 952 F.2d at 1045, the Court is considering the deliberative process privilege aspect of Exemption 5.

**memorandum marked as Exhibit 126 [the January 19, 2012 Knight Memorandum]?** (Dunnegan Dec. Ex. A at 95:1-8.)

\* \* \*

**Q. The one meeting that you do remember having with [Director Kappos] concerning the subject matter of the January 19, 2012 memo, in person, over the phone?**

MR. FARGO:  Objection.

Q. Which one?

A. I believe in person.

**Q.  How long did it last?** (Dunnegan Dec. Ex. A at 114:4-115:17.)

\* \* \*

**Q.  How many discussions did you have with Thomas Krause concerning the subject matter of the memo marked as Exhibit 126?**

MR.  FARGO:   Same objection, deliberative process, attorney/client privilege. Same instruction not to answer.

**Q.  When did you start having those discussions with Mr. Krause?** (Dunnegan Dec. Ex. A at 119:22-120:6.)

\* \* \*

Q.  Now, do you remember or do you not remember a specific conversation with David Carson, the general counsel of the Copyright Office, concerning the subject matter of the Knight memo before the Knight memo was finalized?

A.  I already answered yes.

**Q.  You do remember. In that conversation, what did you say to Mr. Carson, what did Mr. Carson say to you?** (Dunnegan Dec. Ex. A at 127:2-20.)

\* \* \*

**Q. … In the conversation you had with David Carson of the Copyright Office before the issuance of the January 19, 2012 Knight memorandum marked as 126, what did he say to you, what did you say to him?** (Dunnegan Dec. Ex. A at 128:17-25.)

\* \* \*

**Q.  About how long was your discussion with Mr. Carson?**

…

**Q. Why was it what Mr. Carson said on behalf of the Copyright Office important to you in reaching the conclusions set forth in the Knight memorandum?** (Dunnegan Dec. Ex. A at130:23-131:12.)

* * *

**Q. Why did you think it would be beneficial to speak with people beyond the PTO on this issue [concerning the substance of the Knight Memorandum]?** (Dunnegan Dec. Ex. A at 195:13-197:6.)

* * *

Q. Now, putting aside how well versed you were in writing the January 19th memo, other than Mr. Carson, did you go to anyone else or did you consider going to anyone else who had substantial knowledge or experience dealing with the copyright law?

MR. FARGO:  That is a yes or no.

A. Did we ever consider going to anyone else?

Q. Yes.

A. No.

**Q. Why not?** (Dunnegan Dec. Ex. A at 207:25-208:18.)

* * *

**Q. After you saw these lawsuits being filed and after you thought about the possibility of intervening in them, did you take any action next?**

* * *

**Q. Do you have any reason to believe that Mr. Krause did not recommend to Mr. Carson that the Copyright Office join the PTO in intervening in the impending NPL litigations?** (Dunnegan Dec. Ex. A at 223:11-224:18.)

* * *

**Q. Based upon the way you normally interact with Mr. Casagrande and Mr. Krause, would it seem usual or unusual if they were recommending something concerning intervention in the NPL cases without your approval beforehand?** (Dunnegan Dec. Ex. A at 225:20-226:1.)

* * *

**Q. Right, but your group at the PTO made the position [concerning the "necessary and incidental" test] and the Department of Justice just went along with it, right?**

MR. FARGO:  Objection.

A. That's not true, that is not how it works.

Q. How does it work?

A. The way that it works is we develop the position -- you want to object?

**MR. FARGO:  I will allow you to generally answer that as long as you don't get into deliberations of a specific case.** (Dunnegan Dec. Ex. A at 247:7-248:21.)

* * *

Q. And the PTO presented to David Carson the general counsel of the Copyright Office the PTO's formulation of the necessary and incidental standard, right?

MR. FARGO:  I am going to also say that is a yes or no question.

A. We discussed the necessary and incidental standard with David Carson.

**Q. What did he tell you about the necessary and incidental standard?**

…

**Q. Was Mr. Carson in complete agreement with the PTO's position?** (Dunnegan Dec. Ex. A at 255:9-256:12.)

* * *

**Q. Now, Mr. Carson was not in favor of anyone intervening in these actions, correct?**

…

**Q. Was the Copyright Office at all supportive of the decision of the Patent Office to intervene in these cases?**

…

Q. Did the Copyright Office ever express a view concerning the necessary and incidental test that the Patent Office had developed? (Dunnegan Dec. Ex. A at 258:1-259:9.)

* * *

Q. Okay. I mean the copyright system at large. **Have you done any investigation to determine whether or not the application of the necessary and incidental test by a court will impact the copyright system at large?**

…

A. To investigate, we gave thought to that question, but investigate, no.

**Q. What thought did you give to that question?** (Dunnegan Dec. Ex. A at 269:3-270:11.)

* * *

Q. Sir, the copyright office is not a party to this action, right?

A. Not to my knowledge

**Q. Why not?** (Dunnegan Dec. Ex. A at 282:11-20.)

20

* * *

**Q. Now, what was Mr. Carson telling the representatives of the PTO in all those E-mails that are on the privilege log?**

…

**Q. Well, was Mr. Carson debating the necessary and incidental test with the Patent and Trademark Office?**

…

**Q. Who else has approved the necessary and incidental test at the governmental level other than the Patent and Trademark Office?** (Dunnegan Dec. Ex. A at 284:14-285:17.)

* * *

**Q. Now, in that meeting [with the Copyright Office], what was said?** (Dunnegan Dec. Ex. A at 294:20-296:16.)

* * *

A. You know, reading this statement concerning whether the PTO should take a position on whether internal copying of copyrighted NPL is fair use, I don't know that, you know, I have knowledge of communications  on whether or not we should take a position.  I think that we did take a position and we were going to take a position and we knew what our position was and people were going to comment on that position.  Not whether we should take it or not.

So just the literal language of this, it seems to be correct to me.

**Q. Now, people were commenting on your position.  Can you tell me that people were not disputing the propriety of the necessary and incidental test?**  (Dunnegan Dec. Ex. A at 295:20-300:8.)

If the Copyright Office Documents are not privileged, there is no reason why

Mr. Knight may not testify concerning the answers to these questions and any

follow up questions.

21

<u>Conclusion</u>

For the reasons set forth above, the Publishers respectfully request that the Court grant their motion for an order: (i) compelling intervening defendant the PTO to produce 16 documents involving its communications with the Copyright Office that the PTO has withheld on the ground of deliberative process privilege; and (ii) compelling further testimony of the General Counsel of the PTO concerning those communications.

Dated:  April 16, 2013

MANTY & ASSOCIATES, P.A.

By: /e/ Timothy J. Pramas
Timothy J. Pramas (#240321)
510 First Avenue North, Suite 305
Minneapolis, MN 55403
(612) 340-7950

-and-

DUNNEGAN & SCILEPPI LLC

By: /e/William Dunnegan
William Dunnegan (*pro hac vice*)
Laura Scileppi (*pro hac vice*)
350 Fifth Avenue
New York, New York 10118
(212) 332-8300

Attorneys for the Plaintiffs