# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

American Institute of Physics, John
Wiley & Sons, Inc., and Wiley
Periodicals, Inc.,

Civ. No. 12-528 (RHK/JJK)

       Plaintiffs,

v.

Schwegman Lundberg & Woessner,
P.A., and John Doe Nos. 1-10,

**REPORT AND RECOMMENDATION**

       Defendants,

v.

The United States Patent and
Trademark Office,

       Intervenor Defendant.

William I. Dunnegan, Esq., and Laura Scillepi, Esq., Dunnegan & Scileppi LLC;
Michelle Kreidler Dove, Esq., Bassford Remele; and Timothy J. Pramas, Esq.,
Manty & Associates, PA, counsel for Plaintiffs.

Devan V. Padmanabhan, Esq., Paul J. Robbennolt, Esq., and Sri K. Sankaran,
Esq., Winthrop & Weinstine, PA; and Robert W. Clarida, Esq., Reitler Kailas &
Rosenblatt LLC, Esq., counsel for Defendants.

Benjamin T. Hickman, Esq., Erika R. Mozangue, Esq., and Friedrich A.P. Siekert,
Esq., Assistant United States Attorneys, counsel for Intervenor Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

     This matter is before the Court on the following motions:

    1.    Plaintiffs American Institute of Physics, John Wiley & Sons,
        Inc., and Wiley Periodicals, Inc.'s (collectively "the

Publishers"), Motion to Dismiss and for Summary Judgment on the Counterclaim of Intervening Defendant the United States Patent and Trademark Office (Doc. No. 93);

2.     The Publishers' Amended Motion for Partial Summary Judgment Establishing the Liability of Defendant Schwegman, Lundberg & Woessner, P.A. ("Schwegman"), for Copyright Infringement (Doc. No. 116);

3.     Intervenor Defendant United States Patent and Trademark Office's ("USPTO") Motion for Summary Judgment on its Fair Use Defense and Counterclaim (Doc. No. 153);

4.     Schwegman's Motion for Summary Judgment (Doc. No. 156);

5.     The Publishers' Motion to Exclude the Expert Witness Testimony of Jean-Pierre Dubé (Doc. No. 160); and

6.     Schwegman's Motion to Exclude Expert Testimony, Report and Declaration of Randall H. Victoria (Doc. No. 190).

The District Court has referred these motions for a Report and Recommendation under 28 U.S.C. § 636 and D. Minn. LR 72.1.

For the reasons that follow, this Court concludes that Schwegman is entitled to the fair use defense as a matter of law and recommends that the District Court grant Schwegman's motion for summary judgment.  In reaching its conclusion regarding fair use, this Court relies in part on evidence presented by Schwegman's expert witness Dr. Jean-Pierre Dubé.  Therefore, this Court addresses the Publishers' motion to exclude Dr. Dubé's testimony and ultimately concludes that the motion should be denied.  This Court further recommends that the District Court deny the remaining motions as moot.

Finally, the Publishers have scheduled a hearing on a motion to exclude the testimony of Schwegman's expert witness Douglas Lichtman, whose expert report addresses public policy implications of the "fair use" analysis in this case. The District Court has also referred that motion to this Court for a Report and Recommendation.  However, because Schwegman is entitled to judgment as a matter of law on its "fair use" defense without considering Lichtman's expert report, the motion to exclude Lichtman's testimony is also moot.  This Court will, therefore, cancel the hearing on the motion to exclude Lichtman's testimony pending the District Court's action concerning this Report and Recommendation.

## FACTS

## I.    Overview and Procedural History

The Publishers produce and distribute scientific journals that contain scholarly articles in several scientific disciplines.  Schwegman is a Minneapolis law firm that specializes in prosecuting its clients' patent applications with the USPTO and foreign patent offices.  Schwegman obtained and later copied eighteen of Plaintiffs' copyrighted scientific journal articles (the "Articles") from a USPTO database and other sources.[1]   The Publishers allege that by getting those copies without paying for a license, and by making internal copies within

---

[1]     The list of these Articles can be found in Schedule A, attached to the Amended Complaint at Doc. No. 41.  Throughout this Report and Recommendation, this Court refers to any individual article by the lead author's last name (i.e., the "McDonald Article").  (Doc. No. 41, Am. Compl., Schedule A.)

3

the law firm, Schwegman infringed the Publishers' copyrights.  Both Schwegman and the USPTO assert that Schwegman's copying of the Articles constitutes a non-infringing "fair use."[2]

The Publishers have changed the focus of their claims since the inception of this litigation.  When the Publishers initially filed this case, they asserted that Schwegman had engaged in unauthorized copying of the Articles constituting copyright infringement by submitting copies of the Articles to the USPTO in conjunction with applications for patents and making various unlicensed internal copies of the Articles within the firm and for the firm's clients.  (*See* Doc. No. 1, Compl. ¶¶ 1, 14–22.)  The Publishers narrowed the scope of the case by later amending their Complaint.  In the Amended Complaint, the Publishers state that they are no longer alleging copyright infringement in this case for the following three types of conduct:

---

[2]    Fair use is an affirmative defense to a claim of copyright infringement and is governed by 17 U.S.C. § 107.  The Publishers have filed similar cases against other patent prosecution law firms.  *See Am. Inst. of Physics v. Winstead PC, et al.*, No. 3:12-cv-1230-M, Doc. No. 44 (N.D. Tex.  Nov. 27, 2012) (asserting identical claims against a different patent prosecution firm to those brought in the Publishers' Amended Complaint in this case);  *John Wiley & Sons, Ltd. v. McDonnell Boehnen Hulbert & Berghoff, LLP*, No. 1:12-cv-1446, Doc. No. 34 (N.D. Ill. July 13, 2012) (same).  At a hearing on May 22, 2013, United States District Judge Barbara M.G. Lynn in the Northern District of Texas informed the parties in *Am. Inst. of Physics v. Winstead* that she was ruling in favor of the patent law firm defendants because she concluded that the law firm was entitled to the fair use defense as a matter of law.  No. 3:12-cv-1230-M, Doc. No. 83 (N.D. Tex. May 22, 2013) (explaining that the court was converting a motion to dismiss to a motion for summary judgment and stating that "Defendants are entitled to the fair use defense under 17 U.S.C. § 107 as a matter of law").

> (i) making such copies of a copyrighted work for submission to the PTO as may be required by the rules and regulations of the PTO, (ii) transmitting such copies to the PTO, or (iii) making one archival copy of that work transmitted to the PTO for Defendants' internal file to document what has been transmitted.

(Doc. No. 41, Am. Compl. ¶ 1.)  Thus, the Publishers have limited their claims of copyright infringement to Schwegman's downloading, storing, making internal copies of, and distributing the Articles by email.  (*Id.* (asserting that this action "arises from the unauthorized copying and/or distribution of Plaintiffs' copyrighted works by a law firm, and its professionals, in connection with their scientific, technical and medical research on behalf of themselves and their clients"); *id.* ¶¶ 13, 20–21 (connecting allegations of Schwegman's unauthorized copying to the law firm's for-profit patent prosecution work).)  Schwegman and the USPTO maintain that even in this more limited conduct, Schwegman's use of the Articles constitutes "fair use."

## II.  Submitting Prior Art with a Patent Application

Although the Publishers have narrowed the scope of their claims in this case and no longer assert infringement for the submission of a copy of any Article to the USPTO, the manner in which Schwegman used the Articles remains intertwined with Schwegman's practice as a patent prosecution firm.[3]

---

[3]    The parties appear to disagree whether the Publishers have conceded that the submission of a copy of an article to the USPTO is a fair use by expressly stating that they are not asserting an infringement claim based on that conduct in their Amended Complaint.  (*See, e.g.*, Doc. No. 188, Pls.' Mem. in Opp'n to Schwegman's Mot. for Summ. J. 16 (arguing that Schwegman's "intermediate

(Footnote Continued on Following Page)

Therefore, the patent application process, and requirements imposed by the USPTO and other patent offices in certain foreign jurisdictions are still relevant to this case.

In the United States, the Patent Act allows the USPTO to grant patents for new, useful, and nonobvious inventions.  35 U.S.C. §§ 101–03.  To determine whether an invention is new, useful, and nonobvious, and whether issuing a patent serves the public interest, the USPTO must become "aware of and evaluate[] the teachings of all information material to patentability."  37 C.F.R. § 1.56(a).  To do this, the USPTO imposes a "duty of candor and good faith in dealing with the Office[.]"  *Id.*  This obligation "includes a duty to disclose to the Office all information known to [an individual associated with the prosecution of a patent application] to be material to patentability[.]"  *Id.*  Patent applicants must submit information regardless of whether it helps or harms their claims of patentability.  *Id.* § 1.56(b)(1)–(2).  This information is often referred to as "prior art."

---

(Footnote Continued from Previous Page)
and incidental" copying of the Articles cannot support a finding of fair use because the Publishers have not conceded that the submission of the Articles to the USPTO was itself a fair use.)  This Court concludes that the Publishers have not conceded this issue.  However, simply narrowing the scope of the claims before the Court cannot dissociate Schwegman's use of the Articles from the firm's patent prosecution practice, and the Publishers cannot point to any evidence that Schwegman's copying was unrelated to its work as a law firm helping clients apply for United States and foreign patents.

So that patent applicants comply with the duty to disclose relevant prior art, the USPTO "encourage[s]" patent applicants to submit an Information Disclosure Statement to the USPTO.  37 C.F.R. § 1.51(d); *Id.* §§ 1.97–1.98.  If the applicant files a disclosure statement, that statement must include, among other things, "a legible copy of . . . [e]ach publication or that portion which caused it to be listed [and] [a]ll other information or that portion which caused it to be listed[.]"  *Id.* § 1.98(a)(2)(ii) & (iv).  Thus, when a patent applicant files a disclosure statement, the USPTO's regulations require the applicant to submit copies of publications, in whole or in part, that are material to the applicant's claims of patentability for her inventions.  *See* 37 C.F.R. § 1.97(i) (providing that if an information disclosure statement does not comply with the requirements of § 1.98, which includes the requirement of providing a legible copy of non-patent literature, it "will not be considered by the Office"); (*see also* Doc. No. 159, Decl. of Paul Robbenolt ("Robbenolt Decl."), Ex. 1, Expert Report of Bradley A. Forrest ("Forrest Report") ¶ 10 ("Generally, if an article is merely cited [as opposed to submitted in full], the Patent Office will not consider it.").[4]  Other than filing a disclosure statement, the record reflects no means by which patent applicants, or any individual associated with the prosecution of a patent application, can or do comply with the USPTO's requirement that that they "disclose to the Office all information known to [] to be

---

[4]     The Publishers have not challenged the admissibility of Mr. Forrest's Report as expert-witness evidence, nor have they submitted any evidence to create a genuine dispute about its conclusions concerning the obligation of disclosure to the patent office.

7

material to patentability[.]"  37 C.F.R. § 1.56(a).  Here, Schwegman provided the

Articles to the USPTO "to comply with the duty of disclosure and to help the

Patent Office determine whether the invention disclosed in the application is

novel and non-obvious and deserving of a patent."  (Forrest Report ¶ 7.)

Schwegman prosecutes foreign patents as well, and Schwegman used

one of the Articles, the Rabeau Article, in helping a client apply for patents from

the Japan Patent Office ("JPO") and the European Patent Office ("EPO").  The

rules governing patent applications in these patent offices are not identical to the

USPTO rules.  For example, the European Patent Convention applies to patent

practice before the EPO.  For a long period, the EPO rules did not require

applicants to submit any prior art, and the patent examiners themselves found

prior art relevant to an EPO patent application.  *See* Jeffrey M. Kuhn, *Information

Overload at the U.S. Patent and Trademark Office: Reframing the Duty of

Disclosure in Patent Law as a Search and Filter Problem*, 13 Yale J. L. & Tech.

90, 135 & n.224 (Fall 2010–2011).  But since January 1, 2011, when the EPO's

Administrative Council's amendment of Rule 141 went into effect, the EPO

imposes a limited duty of disclosure of prior art.  *See* The European Patent

Convention, Implementing Regulations of the Convention on the Grant of

European Patents, Part VII, Ch. VII, Rule 141(1) (effective Jan. 1, 2011)

[hereinafter "Convention Rule 141"], http://www.epo.org/law-practice/legal-

texts/html/epc/2010/e/r141.html.  Convention Rule 141(1) provides that an

applicant who has sought priority for a European patent with respect to an

8

invention for which the applicant has already filed an application for a patent in a

member of the World Trade Organization must file a copy of the results of any

search for prior art that was "carried out by the authority with which the previous

applications was filed."  Convention Rule 141.  Thus, when an applicant for

patent protection under the European Patent Convention already holds a patent

for the same invention in a non-European nation that is a member of the World

Trade Organization, the EPO patent applicant must disclose prior art references

to the EPO.

The Japan Patent Office also imposes an obligation on its patent

applicants to provide references to prior art.  Japan Patent Office, Examination

Guidelines on Requirement for Disclosure of Information on Prior Art Documents

(Provisional Translation) http://www.jpo.go.jp/tetuzuki_e/t_tokkyo_e/pdf/prior_

art_doc.pdf (discussing the obligation facing an applicant for a Japanese patent

under Section 36(4)(ii) of Japan's Patent Law to disclose information on

documents containing prior art that are known to the applicant at the time of filing

a patent application).

The EPO cited the Rabeau Article in an "international search report on

October 24, 2006, and in a European patent application on September 8, 2009."

(Doc. No. 122, 2/25/13 Decl. of William Dunnegan ("2/25/13 Dunnegan Decl."),

Ex. BG, Schwegman's Supplemental Response to Interrogatory No. 13 at 37.)

And the JPO cited the Rabeau Article in an "office action" by an examiner in

connection with a Japanese patent application.  (*Id.* at 38.)  A Schwegman

9

attorney later accessed an electronic copy of the Rabeau Article in Schwegman's electronic document management system in October 2012 in response to the JPO office action and printed out a copy for his review. (*Id.*)

## III.    The Audience for the Articles

Because this case involves Schwegman's assertion of a "fair use" defense, the Court must consider, among other things, the audience for the Articles. The Publishers publish their journals "for the purpose of informing interested readers of the state of the art of [various scientific disciplines.]"  (Doc. No. 118, Decl. of Susann Brailey ("Brailey Decl.") ¶ 60; Doc. No. 119, Decl. of Christopher McKenzie ("McKenzie Decl.") ¶ 16.)  The Publishers assert that their "interested readers include not only academics, but also researchers in private industry and the government, as well as certain members of the general public." (Brailey Decl. ¶ 60; McKenzie Decl. ¶ 16.)  The Publishers "therefore expect inventors and their patent attorneys to be within the target audience of [their] journals. (Brailey Decl. ¶ 61; McKenzie Decl. ¶ 17.)  Through an organization known as the Copyright Clearance Center, the Publishers identify licenses they have issued to nine law firms allowing those firms "the right to internally reproduce [the Publishers' articles]."  (Doc. No. 163, Decl. of William Dunnegan in Supp. of Pls.' Mot. to Exclude the Expert Witness Testimony of Jean-Pierre Dubé ("4/12/13 Dunnegan Decl.") ¶ 7; 4/112/13 Dunnegan Decl., Ex. E (license agreements between the Copyright Clearance Center and various law firms).)

Schwegman presents evidence that academic journals like those distributed by the Publishers "serve[] as a platform through which original research findings are submitted by authors, peer-reviewed by experts and then transmitted to the intended reader audience of scholars and practitioners." (4/12/13 Dunnegan Decl., Ex. A, Expert Report of Jean-Pierre Dubé ("Dubé Report") ¶ 12.)  Authors of such articles want to have their work published in reputable journals to increase their academic prestige.  (*See* Dubé Report ¶¶ 12–13.)  "Readers searching for high-quality research to read and potentially cite are also essential to the reputation of the journal" in which such articles are published.  (*Id.* ¶ 15.)  This creates a "two-sided market" in which "'authors benefit from greater impact and citations and thus prefer a journal that has more readers, [and] readers benefit from content and thus prefer journals with more articles.'"  (*Id.* (quoting McCabe, M. and C. Snyder, *The Best Business Model for Scholarly Journals: An Economist's Perspective*, Nature Web Focus (July 16, 2004)).)  The Publishers attempt to capitalize on this two-sided market by highlighting the journals' positions and rankings within their various specialties. (*Id.* ¶ 18.)  And they focus on "disseminat[ing] new data and scholarly ideas oriented towards a very specialized, research-oriented audience of readers."[5] (*Id.* ¶ 19.)

---

[5]     All of the Articles are highly technical in nature.  For example, the Rabeau Article, which was published in the journal Applied Physics Letters, is entitled "Diamond chemical-vapor deposition on optical fibers for fluorescence

(Footnote Continued on Following Page)

According to Schwegman's expert witness, economist Dr. Jean-Pierre Dubé, attorneys reviewing scholarly articles to decide whether those articles must be submitted as prior art to a patent office read the articles for a different purpose and fall outside the target audience for such material.  Dr. Dubé states that "[a]ttorneys reviewing articles to determine whether they should be disclosed to the PTO are not reading the articles for the same purpose at [sic] the target audience." (Dubé Report ¶ 11.)  Instead, these attorneys read such articles "to determine if [they] contain subject matter that is relevant to the invention for which the attorney is trying to obtain patent protection, which would then require him to provide a copy to the PTO."  (*Id.* ¶ 12.)  As a result, Dr. Dubé concludes that "patent attorneys are not the target audience or target market for plaintiffs' technical articles."  (*Id.* ¶ 29; *see also id.* ¶ 27.)  Dr. Dubé acknowledges that when an attorney who would be willing to pay gets a copy of an article to review for submission in support of a patent application and does not pay for that copy, this does affect the potential market for and market value of a copyrighted article. (*Id.* ¶ 26.)

---

(Footnote Continued from Previous Page)
waveguiding."  (Brailey Decl. 43, Ex. AO.)  According to its abstract, the Rabeau Article discusses "the diamond growth on optical fibers and transmission of fluorescence through the fiber from the nitrogen-vacancy color center in diamond," and its discoveries involve "critical steps in developing a fiber coupled single-photon source based on optically active defect centers in diamond."  (*Id.*, Ex. AO at 1.)

## IV.   How Schwegman Obtained and Used the Articles

As noted above, this case concerns eighteen scientific articles that the Publishers selected for publications in their scientific journals.[6]  (Brailey Decl., Exs. A, E, H, L, P, S, W, Z, AD, AH, AL, AO, AS, AV; McKenzie Decl., Exs. AY, BB; Robbenolt Decl., Exs. 2–3 (attaching Solensten and Ye articles); Am. Compl. ¶ 14, Schedule A (listing all 18 Articles).)  Schwegman obtained a copy of eleven of the Articles by downloading them from a website maintained by the USPTO known as "PAIR."  (2/25/13 Dunnegan Decl., Ex. BG, Schwegman's Suppl. Resps. to Interrogs. 1–18, *passim*.)   "PAIR" is the USPTO's Patent Application Information Retrieval system, and it consists of both a public and a private application.  United States Patent and Trademark Office, *Check the Filing Status of Your Patent Application*, http://www.uspto.gov/patents/ process/status/index.jsp.  Public PAIR provides interested people access to issued patents and published patent applications.  *Id.*  Private PAIR, on the other hand, "provides secure real-time access to pending application status and history" for registered patent attorneys, independent inventors, and individuals with "customer number[s]" or a certificate.  *Id.*

---

[6]    The Publishers have attached all but two of the Articles to their supporting declarations as part of the summary-judgment record because they are only seeking partial summary judgment on the issues of liability for sixteen of the eighteen Articles attached to the Amended Complaint.  But because Schwegman has moved for summary judgment regarding all eighteen Articles, this Report and Recommendation addresses them all.

For several of the Articles[7] Schwegman obtained from Private PAIR, Schwegman had inherited patent application files from another law firm that cited the relevant corresponding Articles, but the inherited files did not contain copies of the Articles.  (2/25/13 Dunnegan Decl., Schwegman's Suppl. Answers to Interrogs. 1–4, 6–7, 9–12, 16.)  Schwegman downloaded these Articles from Private PAIR after the USPTO listed the Schwegman firm as counsel of record associated with the inherited patent applications, and the attorneys involved stored the copies in Schwegman's electronic file management system.[8]  (*See id.*; *see also* Robbenolt Decl., Ex. 10, Jan. 15, 2013 Dep. of Peter Rebuffoni ("Rebuffoni Dep.") 24:11–21 (discussing Schwegman's shift to a "paperless office").)  The Publishers assert that by downloading these articles from Private PAIR, copying these Articles to the firm's electronic file management system, and opening an electronic copy on a computer screen, Schwegman infringed the Publishers' copyrights.  (Doc. No. 117, Pl.'s Mem. in Supp. of Mot. for Summ. J. Against Schwegman ("Pl.'s Summ. J. Mem.") 15–16.)  Schwegman does not dispute that it paid no licensing fees to the Publishers when it obtained these eleven copies from Private PAIR.

---

[7]    Specifically these include the Greenwald, McDonald, Dabbousi, Drndic, Gadisa, Ginger, Greczynski, Mattoussi, Nguyen, Peumans, and Solomeshch Articles.

[8]    The summary judgment evidence concerning Schwegman's electronic document management system is discussed, *infra* at p. 16–18.

Schwegman also keeps a copy of the remaining Articles it obtained from sources other than Private PAIR in its electronic file management system. (2/13/2013 Forrest Dep. 18:1–21 (discussing the records in the electronic system for all eighteen Articles).)  Schwegman downloaded the remaining seven Articles from a variety of sources.  It downloaded the Fischbein Article from the University of Pennsylvania website.  (2/25/13 Dunnegan Decl., Ex. BG, Schwegman's Suppl. Ans. to Interrog. 5.)  It downloaded the Goncalves Article from an attachment to an email a Schwegman attorney received from an inventor in whose patent application the Goncalves Article was cited as prior art.  (*Id.*, Ex. BG, Schwegman's Suppl. Ans. to Interrog. 8.)  It is not entirely clear how Schwegman first obtained copies of the Rabeau, Lee, and Reneker Articles, but each appears to have been placed on the electronic file management system so that Schwegman's lawyers could use it in the firm's patent-prosecution practice. Schwegman eventually cited each of these Articles in patent applications submitted to the USPTO.[9]  (*See id.*, Schwegman's Suppl. Ans. to Interrogs. 13–

---

[9]      The record shows that Schwegman will occasionally file a patent application with the USPTO and afterward pursue foreign patent applications for its clients.  (Dunnegan Decl., Ex. BI, Feb. 13, 2013 Dep. of Bradley A. Forrest ("2/13/13 Forrest Dep.") 115:21–116:4.)  After the firm used the Rabeau Article in connection with a patent application filed with the USPTO, on October 20, 2009, Schwegman emailed a copy of the Rabeau Article to an attorney in Europe with whom the firm associated to pursue a patent application before the EPO for the same invention.  (*See* Dunnegan Decl., Ex. BK.)  Schwegman also made a physical copy of the Rabeau Article when it printed a copy of the Article in response to an "office action" from the JPO under similar circumstances. (2/13/13 Forrest Dep. 15:1–8.)

14, 18.)  And it is unclear how Schwegman first obtained a copy of the Solensten Article.  But Schwegman states that the date the Solensten Article was added to Schwegman's electronic file management system coincides with the filing of an Information Disclosure Statement with the USPTO.  (*Id.*, Schwegman's Suppl. Ans. to Interrog. 15.)  Finally, Schwegman obtained the Ye Article by downloading it subject to a license from one of the Publishers, American Institute of Physics.  (*Id.*, Schwegman's Suppl. Ans. to Interrog. 17.)

The Publishers allege that Schwegman engaged in a similar course of infringing activity with these non-Private PAIR Articles.  Specifically, the Publishers assert that Schwegman infringed their copyrights by: (1) obtaining copies of these Articles through emails, from the internet, and otherwise; (2) storing copies of these Articles on the firm's electronic file management system; (3) viewing these Articles on computer screens shortly after placing them in that electronic file management system; (4) emailing copies of certain Articles to the firm's clients; and (5) in two instances, emailing one Article to another attorney in connection with a foreign patent application in Europe, and making physical copy of that Article in connection with a foreign patent application in Japan.  (*See* Pls.' Summ. J. Mem. 16–19.)

## V.    Schwegman's Electronic Document Management System

Because the Publishers assert that Schwegman is unfairly operating an electronic library by creating an electronic database of scientific articles in the manner described above, this Court discusses the record evidence regarding

16

Schwegman's electronic document management system below.  The record demonstrates that after it first obtained a copy of each of the Articles, Schwegman stored a copy in its electronic document management system.  (*See* Robbenolt Decl., Ex. 12, Feb. 13, 2013 Dep. of Bradley Forrest ("2/13/2013 Forrest Dep.") 18:1–21 (discussing the records in the electronic system for all eighteen Articles); 2/25/13 Dunnegan Decl., Ex. BG, Schwegman's Suppl. Resps. to Interrogs. 1–18, *passim*.)  Schwegman's system allows attorneys in the firm to access documents stored on the firm's server.  (*See* Robbenolt Decl., Ex. 11, Jan. 15, 2013 Dep. of Patrick McNally ("McNally Dep.") 72:22–73:5.)  When Schwegman obtains Articles and places them on the firm's server, Schwegman does not place any restrictions on its attorneys' ability to access those files.  (McNally Dep. 73:7–13.)

Once Schwegman has loaded a scientific article to its electronic system, as it did with the Articles in this case, "[a]nyone that has access to [the system] could do whatever it is that they need to do with that [article]."  (2/25/13 Dunnegan Decl., Ex. BL, Jan. 15, 2013 Dep. of Peter Rebuffoni ("1/15/2013 Rebuffoni Dep.") 127:22–128:6.)  Nevertheless, Schwegman maintains this "database of documents . . . so that they can properly be communicated to the Patent Office."  (McNally Dep. at 74:9–21; *id.* at 75:3–9 (stating that Schwegman's purpose in having this electronic file storage is "to properly maintain a database of references so that [it] can cite them to the Patent Office").)  And Schwegman's document management system does not provide

17

attorneys or other firm personnel the opportunity to search the text of articles stored in the system.  (Robbenolt Decl., Ex. 1, Forrest Report ¶ 23.)  Instead, Schwegman's personnel can search certain data fields relating to an article, like the author and title.  (*Id.*)  But searching for prior art that is material to a patent application merely by considering the title and author of the work is not a common practice at Schwegman and would not be "useful" because "relevant content in an article may not be found in the title or author fields."  (*See id.*)

## DISCUSSION

### I.    Summary-Judgment Motions

#### A.    Summary-Judgment Standard

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009); *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322; *Whisenhunt v. Sw. Bell Tel.*, 573 F.3d 565, 568 (8th Cir. 2009).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  In other words, a party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *see Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247–49).

## B.      Analysis

### 1.      Schwegman's Motion

#### a.      Fair Use

Schwegman primarily argues that its motion for summary judgment on the Publishers' claims for copyright infringement should be granted in its favor because Schwegman's use of the Articles qualifies as a "fair use" under 17 U.S.C. § 107.  Copyright infringement occurs when a person violates one or more of the exclusive rights of the copyright owner, which includes the rights to "to reproduce the copyrighted work in copies or phonorecords" and authorize others to do the same.  17 U.S.C. § 106(1).  To succeed on a copyright infringement claim, the copyright holder must demonstrate that he owns a valid

copyright and that the defendant has copied, displayed, or distributed protected elements of the copyrighted work without authorization.  *William A. Graham Co. v. Haughey*, 430 F. Supp. 2d 458, 465 (E.D. Pa. 2006).  However, even if the copyright holder makes this prima facie showing, the accused infringer may avoid liability under the doctrine of fair use.

The fair use defense exists to satisfy the need in the area of copyright protections for "some opportunity for fair use of copyrighted materials . . . to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, § 8, cl. 8).  The doctrine of fair use is judicially created, but Congress codified the doctrine in the Copyright Act of 1976 at 17 U.S.C. § 107. Section 107 provides that "the fair use of a copyrighted work, including such use in copies or phonorecords or by any other means . . . , for purposes such as criticism, comment, news reporting, teaching[,] or research, is not an infringement of copyright."  *Id.*

To determine whether a particular use of a work is a fair use, courts must consider the following four non-exclusive factors:

(1)   The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)   The nature of the copyrighted work;

(3)   The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)     The effect of the use upon the potential market for or value of the copyrighted work.

*Id.*; *see also Campbell*, 510 U.S. at 577–78 (noting that the four factors are non-exclusive).  Courts must weigh all these factors together "in light of the purposes of copyright."  *Campbell*, 510 U.S. at 578.  Determining whether a particular use is a fair use "is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for a case-by-case analysis."  *Id.* at 577.  The affirmative defense of fair use "may be resolved on summary judgment if a reasonable trier of fact could reach only one conclusion."  *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989); *see also Belmore v. City Pages, Inc.*, 880 F. Supp. 673, 677 (D. Minn. 1995) ("If, after applying the four factors, there are no material factual disputes, fair use may be resolved on summary judgment.").

### i.     The purpose and character of the use

Concerning the first factor of the fair use analysis, the Supreme Court has explained that district courts must be "guided by the examples given in the preamble to Section 107, and should look to whether the use of the copyrighted material was for 'criticism, comment, news reporting, teaching, . . . scholarship, or research.'"  *Antioch v. Scrapbook Borders, Inc.*, 291 F. Supp. 2d 980, 987–88 (D. Minn. 2003) (discussing *Campbell*, 510 U.S. at 579).  When an alleged infringer's use of the copyrighted work is "for the same intrinsic purpose as [the copyright holder's] . . . such use seriously weakens a claimed fair use."  *Id.* at 988 (quotations omitted).  In many cases, the critical fair use inquiry on the first factor

is whether an alleged infringer's secondary work is "transformative" or, in other words, "whether the new work merely 'supersede[s] the objects' of the original creation' 'or instead adds something new with a further purpose or different character, altering the first with new expression, meaning, or message.'" *See id.* (quoting *Campbell*, 510 U.S. at 579).  For an alleged infringer's secondary work to be transformative, she must do something new with the copyrighted work such as creating "new information, new aesthetics, new insights and understandings." *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 142 (2d Cir. 1998).  If a defendant's use of the copyrighted work is highly transformative, this will decrease the significance of other factors that may weigh against a finding of fair use.  *Antioch Co.*, 201 F. Supp. 2d at 988.

There is no genuine dispute here about the purpose for which Schwegman downloaded and made internal copies of all eighteen Articles.  Even viewing the evidence in the light most favorable to the Publishers, a reasonable jury could only conclude that Schwegman's purpose in downloading and making internal copies of the Articles was to ultimately comply with the legal requirement to provide prior art to the USPTO and to represent its clients' interests in obtaining patents in Europe and Japan.  Schwegman's business is representing its clients in their efforts to obtain patents from the USPTO and other international patent offices.  And it is undisputed that Schwegman cited and provided a copy of every one of the Articles in separate patent applications.  There is no evidence in the record that would allow a reasonable juror to conclude that Schwegman's

22

downloading and internal copying of the Articles served some other purpose or was divorced from Schwegman's compliance with the obligations imposed by various patent offices.

As a result, this Court concludes that there is no reasonable dispute that Schwegman did not use the Articles "for the same intrinsic purpose as [the Publishers.]"  *See Antioch*, 291 F. Supp. 2d at 988.  In fact, the Publishers produced their journals in which the Articles were published for a purpose that has little, if any, relationship to Schwegman's purpose in using them. Schwegman's lawyers needed to make internal copies of the Articles and review those copies to provide the USPTO, the EPO, and the JPO with information relevant to the patentability of the firm's clients' inventions.  By contrast, the Publishers distribute the scientific articles in their journals to inform the scientific community of advancements in scientific research and new scientific discoveries that have been made, and to allow the scientific community to test the quality of the authors' methods and conclusions.  (*See* Dubé Report ¶¶ 17–19 (discussing objectives of the Publishers' journals to obtain high profile academic literature to disseminate to specialized research-oriented readers).)  Or, in the words of the Publishers' own declaration: to "inform[] interested readers of the state of the art of physics [which] include not only academics, but also physical scientists and researchers, engineers, educators, and students across all disciplines of the global physical science community, as well as the general public."  (*See* Brailey Decl. ¶ 60; McKenzie Decl. ¶ 16 (noting a similar purpose for non-physics related

23

journals to "inform interested readers of the state of the various arts and sciences [which] include not only academics, but also researchers in private industry and the government, as well as certain members of the general public").)  There is no evidence in the record that the authors wrote the Articles or the Publishers distributed the Articles for the purpose of ensuring that a government agency is provided with the information it needs to determine whether an invention is novel or non-obvious.  Nor is there any evidence that would support a reasonable inference that the actual copyrighted content in the Articles – i.e., their method of expression, as opposed to the facts they convey about a particular scientific development – has any relationship to Schwegman's use of the Articles.  For these reasons, the first factor weighs heavily in favor of finding fair use as a matter of law.

This conclusion does not change merely because the "copying" Schwegman engaged in did not alter the content of the Articles.  That lack of alteration may make the label "transformative use" a messy fit for Schwegman's use since the "transformative use" label is most apt when a secondary work created by an alleged infringer actually alters the content of a copyrighted work or incorporates that content into a new work, such as a parody.  *See, e.g.*, *Campbell*, 510 U.S. at 572–73 & 579–83 (describing how the rap group 2 Live Crew had used aspects of Roy Orbison's rock ballad "Oh, Pretty Woman" in creating a parody of the original and analyzing the critical aspects of 2 Live Crew's new work).  But reproduction of an original without any change can still

24

qualify as a fair use when the use's purpose and character differs from the object of the original, such as photocopying for use in a classroom. *See* 17 U.S.C. § 107 (noting that making copies for classroom use can be an example of fair use); H.R. Rep. No. 94-1476, at 66 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5679 (noting that the fair use doctrine "has as much application to photocopying and taping as to older forms of use"); William F. Patry, *Patry on Fair Use* § 3.9, *Transformative or productive uses in practice* (2013) (discussing availability of fair use defense for certain types of photocopying and noting that some uses that involve no change in the form of the original can be considered fair use).

Cases in which alleged infringers used copyrighted works in connection with judicial proceedings further support this conclusion. In both *Healthcare Advocates Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627 (E.D. Pa. 2007), and *Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003), the alleged infringers made complete copies of the plaintiffs' copyrighted material to ultimately submit as evidence in earlier judicial proceedings. These courts concluded that such use does not supersede the intrinsic purpose of the original because the alleged infringers' evidentiary use was "indifferent to" the copyrightable means of expression. *See Bond*, 317 F.3d at 395 (upholding the district court's conclusion in analyzing the first factor of the fair use defense because the defendants' use of the manuscript had a "narrow purpose . . . for the evidentiary value of its content" that was "indifferent to Bond's mode of expression"); *Healthcare Advocates, Inc.*, 397 F. Supp. 2d at 637 (reasoning that a law firm's copying of copyrighted

material for the purpose of defending its client in an earlier lawsuit "militates in favor of a finding of fair use").  These decisions also suggest that the new and different character of such an evidentiary use extends to the internal copies a law firm makes while it is analyzing copyrighted material and determining whether it would serve its client's interests to present it to a decision-maker.  *See Healthcare Advocates, Inc.*, 397 F. Supp. 2d at 637 (reasoning that creating and displaying internal copies within a law firm of copyrighted material in connection with the firm's defense of a client in a separate action was a fair use and was for a new and different purpose than the original object of the copyrighted works).

Like the law firm's internal copying and display of the copyrighted material in *Healthcare Advocates* and the defendants' use of the copyrighted memoir in *Bond*, Schwegman's allegedly infringing internal copying of the Articles took on an evidentiary character.  Schwegman's allegedly infringing internal copying was connected to determining how best to represent its clients' interests in quasi-judicial proceedings before the USPTO, the EPO, and the JPO.  And as in *Healthcare Advocates* and *Bond*, it would be an absurd result if an attorney seeking to advance her client's interests before a patent office were not permitted to copy and review the very type of information that the attorney is required to evaluate in connection with a patent application.  Stated differently, Schwegman's use of the Articles is narrower than, and indifferent to, their manner of expression.  *Cf. Bond*, 317 F.3d at 395 (noting that the evidentiary use of the manuscript did not "draw on [the plaintiff's] mode of expression).)  The

26

Articles are useful to Schwegman and to the various patent offices as

comparative references for the specific inventions that are the subject of pending

patent applications, and the *facts* and *ideas* reflected in the Articles are of use to

Schwegman, not the Articles' copyrightable manner of expression.  Accordingly,

the only reasonable inference to draw from the summary judgment record is that

the purpose and character of Schwegman's use was different than the intrinsic

purpose for which the Articles were originally produced.

In addition to considering whether the purpose and character of a

defendant's use differs from the intrinsic purpose of the original, courts must also

consider whether an alleged fair use "[i]s commercial in nature, or was a non-

profit, educational use."  *Antioch*, 291 F. Supp. 2d at 988.  This distinction too "is

only one element of the first factor enquiry[.]"  *Campbell*, 510 U.S. at 584.  "The

crux of the profit/non-profit distinction is not whether the sole motive of the use is

monetary gain, but whether the user stands to profit from exploitation of the

copyrighted material without paying the customary price."  *Harper & Row*

*Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985).

Relying on *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S.

539 (1985), the Publishers argue that the first fair use factor should weigh

against Schwegman because Schwegman is a for-profit law firm and derives a

commercial benefit from its use of the Articles.  The evidence shows that

Schwegman charged clients a flat rate for downloading documents from Private

PAIR and billed for attorney and paralegal time spent locating and reviewing

27

relevant prior art.  (*See* 4/12/13 Dunnegan Decl., Ex. D., Feb. 13, 2013 Dep. of
Bradley Forrest 41:4–24 (explaining that Schwegman charges its clients $10 for
non-patent literature and any other document downloaded from Private PAIR);
2/25/13 Dunnegan Decl., Ex. BN, Dep. of Patrick McNally 17:10–18:10
(describing billing for the time spent obtaining articles); *Id.*, Ex. BO, Dep. of Louis
Leichter 25:14–26:13 (discussing reading the Rabeau Article in connection with
billing records).)  However, this is not the kind of use where an alleged infringer
simply "stands to profit from exploitation of the copyrighted material without
paying the customary price."  *Harper & Row Publishers, Inc.*, 471 U.S. at 562.
Because Schwegman's use of the Articles does not supersede the Publishers'
intended use and has a new and different evidentiary character, Schwegman's
"commercial" use of the Articles does not unfairly exploit copyrighted material in
the same way that the defendant did in *Harper & Row.  Id.* at 543–44, 562
(explaining how The Nation ran a story publishing quotes, paraphrases, and facts
drawn exclusively from former President Gerald Ford's memoirs, and thereby
had the purpose "of supplanting the copyright holder's commercially valuable
right of first publication").

　　Finally, the Publishers argue that Schwegman is not entitled to have the
first factor of the fair use defense weighed in its favor as a matter of law by
comparing Schwegman's use of the Articles to the unfair use involved in
*American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994).  In the
*Texaco* case, the defendant employed hundreds of scientists to conduct research

to develop new products and technology for its business in the petroleum industry. *Id.* at 915. One of those scientists, Dr. Donald H. Chickering, made copies of scientific journal articles from publications he believed were relevant to his area of research and engineering work for the company. *Id.* Rather than immediately using the photocopied articles in his work, Dr. Chickering placed the copies in his files "to have them available for later reference as needed." *Id.* In the lawsuit against Dr. Chickering's employer, Texaco, Inc., the publisher of the journal from which the copies were made claimed that Dr. Chickering and other Texaco scientists infringed the publisher's copyrights, and Texaco claimed that Chickering and its other scientists were engaged in a fair use. *Id.* at 916 (discussing the nature of the dispute). Discussing the first factor, the Second Circuit explained that "Chickering had [the articles at issue] photocopied, at least initially, for the same basic purpose that one would normally seek to obtain the original—to have it available on his shelf for ready reference if and when he needed to look at it." *Id.* at 918. In other words, Chickering's practice, and the practice of the other Texaco scientists, allowed each scientist to maintain his own personal reference library "without . . . having to purchase another original journal" for each researcher. *See id.* at 919.

This case is not *Texaco*. In *Texaco*, the evidence showed that "the making of copies to be placed on the shelf in Chickering's office [wa]s part of a systematic process of encouraging employee researchers to copy articles so as to multiply available copies while avoiding payment." *Id.* at 920. Here, there is

no evidence that would allow a reasonable jury to conclude that Schwegman is similarly maintaining mini-research libraries so that it can avoid paying for separate licenses for each of its lawyers, thereby superseding the original purpose of the Articles.[10]  As explained above, the evidentiary character of Schwegman's copying differentiates the firm's use of the Articles from the Articles' original purpose, and a reasonable jury can only weigh factor one in favor of fair use.

### ii.   The effect on the market for the Articles

Although typically the fair use factors are evaluated in the order they are listed in 17 U.S.C. § 107, this Court turns now to the "fourth factor" concerning the effect on the market for the Articles because it is closely related to the "first factor" involving the purpose and character of the use.  Evaluating this next factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original."  *Campbell*,

---

[10]   In a different case, the first factor could tip against a law firm like Schwegman if, for example, the law firm was claiming that it was fair use for it to make a copy for every attorney at the firm of a copyrighted legal treatise on patent prosecution or a practitioner's manual on effective methods for filing patent applications with the USPTO or other patent offices.  The firm's use of such materials would likely be identical to the original object of the work—i.e., to teach lawyers how to prosecute patents.  And such a hypothetical law firm, like the defendant in *Texaco*, would be systematically avoiding paying licensing fees by multiplying copies for its employees to use copyrighted materials exactly how they were intended to be used.

510 U.S. at 590 (quotations omitted).  When a defendant uses a copyrighted work that does not usurp the market for the copyrighted work, the fourth factor leans toward fair use.  *Id.* at 593.  "Only an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable[.]"  *Texaco*, 60 F.3d at 930.

The Publishers present no evidence that the patent lawyers' use of the scientific Articles to meet their obligations to disclose prior art to the PTO adversely affects the traditional target market for these Articles, i.e., academics, physical scientists and researchers, engineers, educators, students, and members of the general public who want to read peer-reviewed scholarly, highly specialized articles about the physical sciences and other scientific disciplines.  The publishers come forward with no evidence to counter Schwegman's evidence, in the form of the expert opinion of Dr. Dubé, that patent lawyers are not within this traditional target market for these publications.  They have no evidence, for example, that a patent lawyer's ability to use a scientific article like one of the highly technical Articles in this case without paying a license fee would somehow disincentivize the authors of those Articles from creating the work in the first place and distributing it to the traditional audience for the work or that this use would reduce demand for the original work by the target audience.

The only evidence that the Publishers submit about adverse market effect is the fact that they lose revenues when patent lawyers do not pay the licensing fees the Publishers expect to receive when the patent firms obtain copies of the

31

articles and then copy and store them for use with the patent applications.  The

Publishers point out that licenses for articles were readily available and they

provide examples of patent law firms around the country that paid for licenses to

scientific publications, although the record is silent about whether these firms

were using the scientific articles to comply with USPTO application requirements

or in connection with obligations imposed by foreign patent offices.  And they

also cite the fact that Schwegman itself took a license from one of the Publishers

to download one of the Articles.

As acknowledged by Dr. Dubé, there is of course some impact on the

market for scientific articles, such as the Articles in this case, when a patent law

firm does not pay licensing fees that a publisher makes available: the Publishers

obviously lose those revenues that might otherwise be obtained.  But this is not

the sort of negative effect on the market that weighs heavily against a finding of

fair use.  If it were, then the market factor would always weigh in favor of the

copyright holder and render the analysis of this factor meaningless.  *See Bill*

*Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006)

("[W]ere a court automatically to conclude in every case that potential licensing

revenues were impermissibly impaired simply because the secondary user did

not pay a fee for the right to engage in the use, the fourth fair use factor would

*always* favor the copyright holder.") (quotations omitted and emphasis in *Bill*

*Graham Archives*); *see* 4 Melville B. Nimmer & David Nimmer, *Nimmer on*

*Copyright* § 13.05[A][4] (Matthew Bender, Rev. Ed. 2012) (noting "[a] danger of

circularity" posed by the fourth factor because "a potential market, no matter how unlikely, has always been supplanted in every fair use case, to the extent that the defendant, by definition has made some actual use of plaintiff's work, which use could in turn be defined in terms of the relevant potential market").  Therefore, the fact that the Publishers may have lost licensing revenue from Schwegman's copying is not determinative and does not create a fact issue for trial.

The Second Circuit's analysis of the market factor in *Bill Graham Archives* is instructive in this case.  There, the court considered whether it was fair use of the defendant to copy images from the plaintiff's copyrighted concert posters and include them in a book about the history of the Grateful Dead rock band.  *Bill Graham Archives*, 448 F.3d at 606.  The court considered the defendant's use of the posters in the book to be "transformative" – the images of the posters were smaller than the originals, and used primarily for a purpose that was different than the posters' original expressive purpose.  *Id.* at 614.  As a result of the fact that under the first factor the defendant's use was for a different purpose than the original purpose of the work, the court concluded that the fourth factor weighed in favor of a finding of fair use because the copyright owner was not entitled to preempt the defendant from exploiting markets for the posters that were neither "'traditional, reasonable, or likely to be developed[.]'"  *Id.* (quoting *Texaco*, 60 F.3d at 930); *see also id.* at 615 ("Since [the defendant's] use of [the plaintiff's] images falls within a transformative market, [the plaintiff] does not suffer market harm due to the loss of license fees.").

33

Thus, *Bill Graham Archives* illustrates how the analysis of the fourth fair use factor of effect on the market can depend heavily on the circumstances impacting the first factor.  Here, the two factors are very closely interrelated.  As discussed in the preceding section, Schwegman used the Articles for a purpose that was different than, and not superseding of, the original purpose for which the Articles were created.  And as a result, Schwegman's copying falls outside any traditional, reasonable, or likely to be developed market.  The fact that the Publishers made licenses to copy works from their journals available to law firms, and that some patent law firms paid for licenses, does not transform patent law firms into a traditional, reasonable, or likely to be developed market.  *Cf. Texaco*, 60 F.3d at 930 (noting that the focus in the fourth factor is on whether an alleged infringing use has an effect on a normal or traditional market for the copyrighted works); *Bill Graham Archives*, 448 F.3d at 614 (concluding that although the plaintiff asserted it had established a market for licensing images like the concert posters at issue and expressed a willingness to license images to the defendant, it had not shown "impairment to a traditional, as opposed to a transformative market"); *Bond*, 317 F.3d at 396–97 (noting that the evidentiary use of the plaintiff's manuscript in a judicial proceeding did not adversely affect the marketability of the memoir).

The Publishers again rely on *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994), to support their argument that factor four should weigh against a finding of fair use.  Specifically, they cite *Texaco* for the

34

proposition that because they made licenses available for their journals and lost

licensing revenue whenever Schwegman made a copy of the Articles, they have

sufficiently established a negative effect on the market resulting from

Schwegman's conduct.  (*See* Doc. No.  117, Pls.' Mem. in Supp. of Mot. for

Partial Summ. J. Establishing the Liability of Def. Schwegman 22.)  But because

the purpose of Schwegman's use of the Articles is different from the original

purpose for which the Articles were created, *Texaco* is distinguishable.  The

scientist Dr. Chickering's use of the journal articles at issue in *Texaco* was

identical to the original purpose for which those articles had been created.

*Texaco*, 60 F.3d at 918–19.  And the widespread copying of journal articles in

*Texaco* simply allowed the defendant's scientists to maintain their own

convenient research libraries without paying for additional licenses.  *Id.* at 919–

20.  Because the nature and character of the defendant's use in *Texaco* purely

superseded the originally intended use under factor one, the defendant's copying

of the articles impacted a traditional and likely market for its journal articles and

the fourth factor weighed against a finding of fair use.  *See id.* at 930 (noting that

"[o]nly an impact on potential licensing revenues for traditional, reasonable, or

likely to be developed markets should be legally cognizable when evaluating a

secondary use's effect upon the potential market for or value of the copyrighted

work") (quotations omitted).  Here, by contrast, Schwegman's evidentiary use of

the Articles is for a new and different purpose, and Schwegman has not

attempted to exploit that originally intended audience for the works.  The

Publishers can point to no evidence to suggest that Schwegman usedthe Articles in the manner they were originally intended to be used.  Thus, the Publishers have failed to show that there is a genuine issue of fact concerning an effect on a traditional, reasonable, or likely to be developed market.

For these reasons, this Court concludes that the fourth factor weighs in favor of finding fair use as a matter of law.

### iii.    The nature of the copyrighted work

The second factor in the fair use analysis requires courts to consider "the nature of the copyrighted work."  17 U.S.C. § 107(2).  This factor "recognizes that some types of works are closer to the core of intended copyright protection than others, *Belmore v. City Pages, Inc.*, 880 F. Supp. 673, 678 (D. Minn. 1995), and as a result, "[t]he scope of fair use is greater when 'informational' as opposed to more 'creative' works are involved."  *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1153–54 (9th Cir. 1986); *Belmore*, 880 F. Supp. at 678. Nevertheless, even when a work qualifies as "creative" and generally receives greater protection, when the purpose of the use is different than that for which the work was originally created, the second factor may be of less importance. *See Castle Rock Enters.*, 150 F.3d at 144; *see also Antioch*, 219 F. Supp. 2d at 994 (citing *Castle Rock* for the proposition that the second factor may be of less importance when assessed in context of some transformative uses, but the nature of the copyrighted work remains significant where the alleged infringing use is only minimally transformative).

36

Based on the undisputed facts, this Court concludes that the nature of the Articles weighs slightly in favor of a finding of fair use.  The Articles are factual or informational.  They primarily communicate very technical information about the results of scientific research.  Where a case involves highly technical scientific journal articles, such as this, the Second Circuit has noted that, "[t]hough scientists surely employ creativity and originality to develop ideas and obtain facts and thereafter to convey the ideas and facts in scholarly articles, it is primarily the ideas and facts themselves that are of value to other scientists in their research."  *See Texaco*, 60 F.3d at 925 n.11.  Like the journal articles in *Texaco*, the Articles here are not primarily "creative" works in which the mode of expression predominates over the conveyance of information.  Thus, the Articles fall a bit farther from the core of intended copyright protection than do other, more "creative" works.

For these reasons, this Court concludes that the second fair use factor weighs in favor of a finding of fair use.

### iv.    The amount and substantiality of the portion used in relation to the work as a whole

The third fair use factor considers "whether the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586 (quotation omitted).  Copying a work in its entirety does not preclude a finding of fair use, but can militate against such a finding.  *See Texaco*, 60 F.3d at 913.  The inquiry

focuses on "whether the extent of . . . copying is consistent with or more than necessary to further the purpose and character of the use." *Castle Rock Enters.*, 150 F.3d at 144 (quotations omitted).

There is no dispute that Schwegman copied the Articles in their entirety. Schwegman's "copying" consisted of obtaining complete electronic copies from Private PAIR and other sources, making complete "copies" by viewing the Articles on computer screens and downloading the Articles to Schwegman's electronic document management system, and emailing electronic copies to the firm's clients and foreign patent prosecution associates. The fact that a complete electronic copy was made each time Schwegman took one of these actions does not, by itself, mean that this factor necessarily preclude a finding of fair use. *Cf. Sony Corp. of Am. V. Universal City Studios, Inc.*, 464 U.S. 417, 449–50 (1984) (concluding that the reproduction of entire audiovisual televised works did not have the ordinary effect of militating against a finding of fair use).

There is also no genuine dispute that Schwegman's copying was necessary to the new and different purpose for which Schwegman made the copies. The evidence permits no reasonable inference other than that Schwegman's copying was essential to allow the law firm to evaluate whether the information in the Articles was prior art that needed to be disclosed in connection with patent applications. Thus, because Schwegman's copying is consistent with the purpose and character of Schwegman's new and different use of the Articles, this Court concludes that this factor favors a finding of fair use.

### v.   Other factors

The Publishers also argue that a finding of fair use is inappropriate because Schwegman never had an "authorized" or licensed copy of the Articles. But the Publishers point to no case or other authority that suggests obtaining a license for copyrighted works is necessary when the use an alleged infringer puts that work to is a fair one.

The Publishers appear to be arguing that because Schwegman never had an "authorized" copy of the Articles in the first instance, the firm's possession of the Articles was unlawful or that the firm acted in bad faith.  There is no indication in the record that Schwegman simply stole the Articles the way a person might when he "pirates" a song on the internet.  Under these circumstances, it would be unreasonable for a jury to conclude that Schwegman acted in bad faith in obtaining a copy of the Articles.  *Cf. Harper & Row*, 471 U.S. at 562–63 (discussing the defendant's alleged bad faith in knowingly exploiting a stolen manuscript of President Ford's memoirs that a rival publication had an exclusive license to print).  The record indicates that, in fact, Schwegman paid a fee to one of the Publishers, American Institute of Physics, to get a copy of the Ye Article. Schwegman obtained eleven of the other Articles from the USPTO's patent-application database in Private PAIR when they inherited their clients' files from other law firms.  And Schwegman obtained other Articles from various sources, some undetermined, one from a university's website, and one from a client. These are not the acts of a "chiseler" going outside the bounds of good faith and

fair dealing that are presupposed in a fair use of copyrighted material. *See id.* at 562 ("Fair use presupposes good faith and fair dealing.") (quotations omitted). And no reasonable juror could conclude on this record that Schwegman acted in bad faith.

### vi.    Conclusion

Having weighed all these factors, this Court concludes that Schwegman is entitled to the fair use defense as a matter of law.  The record demonstrates no genuine dispute that Schwegman's use of the Articles was new and different than and did not merely supersede the original purpose of the Articles.  Also, the undisputed facts demonstrate that the nature of the Articles is predominantly informational.  Further, although Schwegman did make complete copies of the Articles in its patent prosecution practice, the only reasonable inference to draw from the record is that Schwegman's copying of the Articles was consistent with the new and different purpose and character of Schwegman's use.  And there is no evidence to suggest that Schwegman's copying impacted a traditional, reasonable, or likely to be developed market for the Articles.  Thus, all four fair use factors weigh in favor of finding that Schwegman's use in this matter is fair as a matter of law.

The fair use defense requires courts "'to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell*, 510 U.S. at 577 (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).  We conclude that Schwegman's use would not stifle

the creativity that the Copyright Act is designed to foster because there is no

evidence in the record that authors of scientific journal articles will be less likely

to publish what they have discovered due to Schwegman's use or that

Schwegman's use would create any reasonable disincentive for the Publishers to

stop publishing their journals.

Finally, Schwegman's copying of the Articles and its use of those copies

for the purpose of supporting its clients' patent applications also "promote[d] the

Progress of Science and useful Arts," U.S. Const., art. I, § 8, cl. 8, which is the

very purpose of the Copyright Act.  Uses of copyrighted work that fulfill that

purpose include "criticism, comment, news reporting, teaching . . ., scholarship,

or research."  17 U.S.C. § 107.  Though they borrow from a copyrighted work,

criticism, comment, news reporting, teaching, scholarship, and research all have

the potential, under certain circumstances, to benefit the public by furthering the

understanding of ideas or discoveries highlighted in a copyrighted work.  And like

each of these listed uses, Schwegman's use of the Articles in connection with its

clients' patent applications confers a public benefit as well.  *See Campbell*, 510

U.S. at 577 (explaining that the examples of fair uses in § 107's preamble are not

exclusive and citing 17 U.S.C. § 101).  Schwegman's use of the Articles

facilitates the complete disclosure required in the patent-application process,

assisting patent examiners in determining whether applications for patent

protection should be granted, and, consequently, fulfilling the very same purpose

41

of promoting science and the arts that the Copyright Act was intended to accomplish.

For all these reasons, Schwegman is entitled to judgment as a matter of law on its defense of fair use. Because this Court concludes that Schwegman is entitled to judgment as a matter of law on its fair use defense, it also concludes that it is unnecessary to address Schwegman's remaining arguments in its motion for summary judgment.

### 2.     The Publishers' Motion

Because this Court concludes that Schwegman's motion for summary judgment should be granted on the grounds that there are no genuine issues of material fact and Schwegman is entitled to judgment as a matter of law on its affirmative defense of fair use, this Court concludes that the Publishers' motion for summary judgment is moot.

### 3.     USPTO's Motion

Likewise, because this Court recommends that Schwegman's motion for summary judgment be granted on the grounds that there are no genuine issues of material fact and Schwegman is entitled to judgment as a matter of law on its affirmative defense of fair use, the USPTO's motion for summary judgment on its

counterclaim for a declaratory judgment based on the fair use defense[11] should

be denied as moot.

## II.   Motions to Exclude Expert Testimony

The three motions to exclude expert testimony referred by the district court

address the proposed testimony to be provided by Schwegman's expert

Dr. Jean-Pierre Dubé, the Publishers' expert Dr. Randall H. Victoria, and

Schwegman's expert Douglas Gary Lichtman.  For the reasons that follow, this

Court concludes that Dr. Dubé's testimony need not be excluded under the

relevant Rules of Evidence and the guidelines established in *Daubert v. Merrell*

*Dow Pharm., Inc.*, 509 U.S. 579 (1993), and the other two motions should be

denied as moot.

### A.   Legal Standard

The Federal Rules of Evidence allow an expert to provide testimony when

"(1) the testimony is based upon sufficient facts or data, (2) the testimony is the

product of reliable principles and methods, and (3) the witness has applied the

principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  The

expert witness must be "qualified as an expert by knowledge, skill, experience,

training, or education."  *Id.*  The proponent of expert testimony must prove that it

---

[11]      In essence, the USPTO's assertion of a fair use defense is no different
than saying that the USPTO agrees with Schwegman's position that Schwegman
engaged in fair use in this case.  Viewed in that light, the USPTO's interest in this
case is comparable to that of an amicus, not a party with a cognizable Article III
case or controversy.

is admissible by a preponderance of the evidence.  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

The district court has a "gatekeeping" obligation to ensure that all testimony admitted under Rule 702 is reliable.  *See Daubert*, 509 U.S. at 589.  To determine whether expert witness testimony is admissible, a court must consider, among other factors, whether the methodology is generally accepted within the discipline.  *Id.* at 593–94.   The analysis is intended to be flexible, *id.* at 594, and a court can adapt or reject the factors identified in *Daubert* as a particular case demands.  *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).  Expert testimony is not admissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).

### B.    Analysis

#### 1.    Plaintiffs' Motion to Exclude Dr. Dubé's Testimony

##### a.    The Content of the Testimony

This Court briefly discussed Dr. Jean-Pierre Dubé's testimony above.  *See* discussion, *supra* at p. 11–12, but expands on it here.  In his expert report, Dr. Dubé avers that he has achieved a Ph.D. in economics at Northwestern University.  (Dubé Report ¶ 3.)  He is a member of the faculty at the University of Chicago Booth School of Business, and has an impressive record of research fellowships, awards, and publications in his academic career.  (*Id.* ¶¶ 4–6.)

In his expert report, Dr. Dubé states that he bases his opinions on his own experience and training as well as the materials he reviewed in preparing the report, including various motion papers, pleadings, and discovery materials produced in this litigation.  (Dubé Report ¶ 2, Ex. B.)  Dr. Dubé provides his opinions on the purpose of academic journals, how the Publishers' journals fit a particular economic model, how the allegations of unauthorized copying in this case relate to that economic model, how those allegations relate to the Articles' purpose and character and any effect on the market for the Articles, and the current state of the publishing industry.  (*Id.* ¶ 10.)  Relying on sources that describe the market for academic journals reflecting original research, Dr. Dubé concludes that academic journals attempt to increase their prestige by getting more prominent academics to publish their articles in high-profile journals.  (*Id.* ¶ 15.)  Meanwhile, academics attempt to increase their own prestige by being published in more reputable journals.  (*Id.* ¶ 13.)  Dr. Dubé refers to this as a "two-sided market," which has resulted in the development of a model in economics literature that has been used to study both for-profit and not-for-profit scholarly journals.  (*Id.* ¶ 15.)  In this model, "'authors benefit from greater impact and citations and thus prefer a journal that has more readers[, and] readers benefit from content and thus prefer journals with more articles.'"  (*Id.* (quoting McCabe, M. and C. Snyder, *The Best Business Model for Scholarly Journals: An Economist's Perspective*, Nature Web Focus (July 16, 2004)).)

Dr. Dubé further explains that academic journals "serve[] as a platform through which original research findings are submitted by authors, peer-reviewed by experts and then transmitted to the intended reader audience of scholars and practitioners." (Dubé Report ¶ 12.)  He states that, the Publishers' journals attempt to capitalize on the two-sided market for academic journals by highlighting the journals' positions and rankings within their various specialties. (*Id.* ¶ 18.)  They focus on "disseminat[ing] new data and scholarly ideas oriented towards a very specialized, research-oriented audience of readers."  (*Id.* ¶ 19.) According to Dr. Dubé, the "intended purpose of the published content in these journals is for consumption of the intellectual findings and knowledge by 'experts' in the scientific subfields represented."  (*Id.* ¶ 27.)

Dr. Dubé opines that "[a]ttorneys reviewing articles to determine whether they should be disclosed to the PTO are not reading the articles for the same purpose at [sic] the target audience."  (Dubé Report ¶ 11.)  He says these attorneys read such articles "to determine if [they] contain[] subject matter that is relevant to the invention for which the attorney is trying to obtain patent protection, which would then require him to provide a copy to the PTO."  (*Id.* ¶ 11; *see also id.* ¶ 25.)  Further, Dr. Dubé states that when an attorney gets a copy of a scientific article to review in determining whether it is relevant prior art that must be submitted in support of the patent application, there is an effect on the market for the article, but the "incidental" copies Schwegman creates through the use of its technology and otherwise as it is prosecuting patents for its clients "do

not constitute a source of willingness-to-pay by the defendants and do not harm

the market value of the [Publishers'] journals." (*Id.* ¶ 26–28.)

### b.   Whether the Testimony is Admissible

The Publishers argue that Dr. Dubé's testimony is not admissible on the

following grounds: (1) Dr. Dubé lacks expertise in copyright law; (2) Dr. Dubé's

testimony will not assist a jury in resolving fact issues concerning the first or

fourth fair use factors; (3) Dr. Dubé's opinions concerning the first factor are not

based on an accepted methodology; (4) Dr. Dubé's opinions concerning the

fourth factor are based on flawed reasoning; and (5) Dr. Dubé's opinions

concerning the fourth factor are not based on sufficient facts and data. (Doc.

No. 162, Pls.' Mem. in Supp. of Mot. to Exclude Testimony of Dr. Jean-Pierre

Dubé, *passim.*)

This Court concludes that Dr. Dubé should not be excluded as a witness

on grounds that he is not an expert in copyright law or on grounds that his

testimony will not be helpful to a jury in understanding the facts relevant to the

first and fourth fair use factors. The fact that Dr. Dubé has no specific training or

expertise in copyright law is not relevant to the admissibility of his testimony.

Dr. Dubé is a qualified witness who can testify about the intended audience for

the Publishers' academic journals and the articles that are published in those

journals. He has extensive experience in the market for academic publications,

including working as an editor and advisor for various journals, and serving in a

leadership capacity for leading journals in his field. He has published on two-

sided economic markets that he concludes accurately describes the market for academic journals.  He used that experience and knowledge in his expert report to draw conclusions about the impact Schwegman's use would have on the target market for the Articles.  As a result of his experiences and knowledge of the very subject matter that is most relevant to Schwegman's fair use defense, Dr. Dubé is sufficiently qualified to provide testimony about the original intended purpose and character of the Articles and the effect on the traditional market for those Articles caused by Schwegman's use.  Dr. Dubé's testimony will be helpful to a trier of fact because these topics are plainly outside the knowledge and expertise of the ordinary juror.

The Publishers' argument that Dr. Dubé's testimony is based on an improper methodology relies entirely on a quotation from his deposition that is presented out of context and ignores the fact that Dr. Dubé reached his conclusions by applying his expertise in and knowledge of the market for academic journals.  The Publishers assert that rather than using an established methodology, Dr. Dubé only used "common sense" to form his conclusion that Schwegman's internal copying to comply with patent office rules on providing prior art would favor a finding of fair use.  (Doc. No. 163, 4/12/13 Dunnegan Decl., Ex. B, Mar. 16, 2013 Dep. of Jean-Pierre Dubé 191:3–11.)  But, when read in context of Dr. Dubé's other testimony about this very subject, his opinion is plainly based on the conclusions he was able to draw from his training and experience.  (Doc. No. 196, Decl. of Devan Padmanaban, Ex. A, Mar. 16, 2013

Dep. of Jean-Pierre Dubé 165:17–167:16 (explaining that Dr. Dubé based his opinion that factor one of the fair use analysis would favor Schwegman if it was making copies to adhere to a legal duty to provide copies of prior art to the USPTO on his training and experience).)  The Publishers' citation to a single portion of Dr. Dubé's testimony that it may believe contradicts this evidence does not convince this Court that Schwegman has failed to carry its burden to prove that Dr. Dubé's testimony is admissible by a preponderance of the evidence. *See Lauzon*, 270 F.3d at 686.

Dr. Dubé also should not be excluded as a witness on the ground that his opinions are not based on sufficient facts or data.  The Publishers challenge the admissibility of Dr. Dubé's opinions because he was unaware that the Publishers made annual licenses available for their journals, he did not know that Schwegman was not legally obligated to download Articles from Private PAIR, and he assumed that placing copies of the Articles on Schwegman's document management system was done to adhere to legal duties of disclosure.  This Court concludes that Dr. Dubé's opinions are not based on conjecture or speculation, but on the evidence that was available to him at the time Schwegman produced his report.  The Publishers objections to Dr. Dubé's testimony are, therefore, objections to the weight of his unrebutted evidence, not a basis to exclude his testimony.  *See Loudermill v. Dow Chemical Co.*, 863 F.2d 566, 570 (8th Cir. 1988) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the

opposing party to examine the factual basis for the opinion in cross-examination.").

For these reasons, and because Schwegman has proven by a preponderance of the evidence that Dr. Dubé's testimony is admissible, the Publishers' motion to exclude Dr. Dubé's testimony should be denied.

### 2. Schwegman's Motion to Exclude Dr. Victoria's Testimony

Because this Court has concluded that summary judgment is appropriate on Schwegman's fair use defense, and none of Dr. Randall Victoria's testimony or other evidence is relevant to that defense, this Court need not consider Schwegman's motion to exclude Dr. Victoria's testimony.  Therefore, this motion should be denied as moot.

### 3. The Publishers' Motion to Exclude Douglas Lichtman's Testimony

Scwegman's expert Douglas Lichtman provided an expert report that Schwegman submitted in support of its motion for summary judgment, and Licthman's report primarily discusses his view of the public policy implications of the fair use analysis in this case.  Even without considering Lichtman's report, however, this Court has concluded, as a matter of law, that Schwegman's use of the Articles in this case was a fair use.  Therefore, the Publishers' motion to exclude Lichtman's opinions is moot, and this Court has not and does not need to consider whether that report is admissible.  Accordingly, this Court recommends that the District Court deny the Publishers' pending motion to

exclude Lichtman's expert testimony (Doc. No. 222) as moot.  The hearing currently scheduled on that motion, which the District Court has referred to this Court for a report and recommendation, will be cancelled pending the District Court's action concerning this Report and Recommendation.

## RECOMMENDATION

Based on the foregoing, and on all the records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.     The Publishers' Motion to Dismiss and for Summary Judgment on the Counterclaim of Intervening Defendant the United States Patent and Trademark Office (Doc. No. 93), be **DENIED AS MOOT**;

2.     The Publishers' Plaintiffs' Amended Motion for Partial summary Judgment Establishing the Liability of Defendant Shwegman, Lundberg & Woessner, P.A. for Copyright Infringement (Doc. No. 116), be **DENIED AS MOOT**;

3.     Intervenor Defendant United States Patent and Trademark Office's Motion for Summary Judgment on its Fair Use Defense and Counterclaim (Doc. No. 153), be **DENIED AS MOOT**;

4.     Schwegman's Motion for Summary Judgment (Doc. No. 156), be **GRANTED**;

5.     The Publishers' Motion to Exclude the Expert Witness Testimony of Jean-Pierre Dubé (Doc. No. 160), be **DENIED**;

6.      Schwegman's Motion to Exclude Expert Testimony, Report and

Declaration of Randall H. Victoria (Doc. No. 190), be **DENIED AS MOOT**;

7.      The Publishers' Motion to Exclude Expert Testimony of Douglas

Lichtman (Doc. No. 222), be **DENIED AS MOOT**; and

8.      This case be **DISMISSED WITH PREJUDICE**.


Dated:  July 30, 2013

                                                    _s/ Jeffrey J. Keyes_____
                                                    JEFFREY J. KEYES
                                                    United States Magistrate Judge


Under D. Minn. LR 72.2(b) any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**August 13, 2013,** a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **fourteen days** after service thereof.  All briefs filed
under this rule shall be limited to 3500 words.  A judge shall make a de novo
determination of those portions of the Report to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable directly to the Circuit Court of
Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C.
§ 636 to review a transcript of the hearing in order to resolve all objections made
to this Report and Recommendation, the party making the objections shall timely
order and file a complete transcript of the hearing within **ten days** of receipt of
the Report.